UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-161 (DSD/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S SUPPLEMENAL** |
| | ) | **POSITION REGARDING** |
| v. | ) | **SENTENCING** |
| | ) | |
| LORENZO EUGENE HEARD JR., | ) | |
| | ) | |
| Defendant. | ) | |

# INTRODUCTION

The Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), mandates a 15-year mandatory minimum sentence for defendants with three prior convictions for a "serious drug offense" or "violent felony" committed on occasions different from another. A "serious drug offense" includes a drug offense under State law "involving manufacturing, distributing, or possession with the intent to manufacture or distribute, a controlled substance" as defined at 18 U.S.C. § 802, and punishable by a maximum term of ten years or more in prison. 18 U.S.C. § 924(e)(2)(B)(ii).

The general issue presented is whether the defendant's two prior convictions for Second Degree Drug Sale in Minnesota are "serious drug offense[s]" under the ACCA. And more specifically, whether Minnesota's definition of hallucinogen, including methylenedioxymethamphetamine (MDMA), is broader than the federal definition under the Controlled Substances Act. Here, the defendant argues his prior convictions for Second Degree Sale are not "serious drug offense[s]" under the ACCA because the Minnesota drug statute purportedly criminalizes innocent isomers of MDMA while the federal law does

not.

Contrary to the defendant's argument, Minnesota and federal law define the terms hallucinogen and isomer in the same way. The relevant and controlling portion of the Minnesota statute is essentially identical to the corresponding provision within the federal Controlled Substances Act. The state and federal definitions are near exact matches. Thus, the Minnesota drug statute does not criminalize all possible isomers of MDMA. The defense's supplemental position regarding sentencing omits the primary and controlling definitions of hallucinogen and isomer under Minnesota law. The defense's interpretation of Minnesota's drug law also runs counter to the state's canons of statutory construction. In consideration of the entire statute and Minnesota's legislative intent, it is clear that the Minnesota drug statute does not define hallucinogen more broadly than federal law.

## BACKGROUND

On September 18, 2019, the defendant pled guilty to a one-count Information charging him with Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1). Before committing this offense, the defendant had three prior convictions for a violent felony or serious drug offense that were committed on different occasions. Presentence Investigation Report (PSR) ¶ 25. On December 24, 1999, the defendant hit a person with a shovel in Austin, Minnesota. PSR ¶ 36. He later pled guilty to Third Degree Assault. *Id.* On June 25, 2009, the defendant displayed a knife and made a throat-slit motion with his finger to a gas station store clerk in Cobb County, Georgia. PSR ¶ 38. The defendant then took various items from the store. *Id.* The defendant later pled guilty to Robbery by Intimidation. *Id.* Both the assault and robbery are considered violent felonies under the

ACCA. *United States v. Wadena*, 895 F.3d 1075, 1076 (8th Cir. 2018) (per curiam) (holding Minnesota third-assault is a violent felony under 18 U.S.C. § 924(e)); *United States v. Thomas¸* 280 F.3d 1149, 1159-60 (7th Cir. 2002) (holding Georgia's robbery by intimidation is a violent felony under the ACCA's force clause).

On October 23, 2009, the defendant sold 99 Ecstasy pills to a confidential reliable informant (CRI) for $1,000. PSR ¶ 41; Attachment 1, Complaint at p. 5. On October 30, 2009, the defendant sold another 98 pills of Ecstasy to the same CRI for another $1,000. PSR ¶ 41; Attachment 1, Complaint at p. 6. According to the complaint, both sets of pills were sent to the Minnesota BCA for analysis and "tested positive for MDMA, a hallucinogen, a Schedule I controlled substance." Attachment 1, Complaint at p. 5-6. The defendant was charged, *inter alia,* with two counts of Second Degree Drug Sale of 10 grams or more of a mixture containing "amphetamine, phencyclidine, or hallucinogen." Attachment 1, Complaint pp. 2-3. On July 21, 2011, the defendant pled guilty to the two Second Degree Drug Sale counts and was later sentenced to 68 months' imprisonment. PSR ¶ 41.

On May 18, 2021, the defendant submitted a supplemental sentencing memorandum claiming for the first time that his two Minnesota drug sale convictions do not qualify as predicate ACCA serious drug offenses *See* ECF 90. The defendant contends that Minnesota law regulates isomers of MDMA that are not covered by federal law, and renders the Minnesota definitions of MDMA overly broad as compared to federal law. Specifically, he claims that by failing to define the term "isomer," the Minnesota definition of isomer must include all possible isomers of MDMA, while the federal definition is limited to the optical,

positional, and geometric isomers. Hence, the defendant argues that a person could be convicted in Minnesota for selling legal isomers of MDMA that are not controlled substances under federal law.

Argument

## A. The Categorical Approach and the Divisible Minnesota Statute

### 1. The categorical approach

To qualify as a "serious drug offense" as defined by the ACCA, a defendant's state convictions must "involv[e] manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance" that is listed on the federal controlled substances schedules. See 18 U.S.C. § 924(e)(2). To determine whether a prior conviction qualifies as a predicate offense for purposes of a federal sentencing enhancement, the court applies a categorical approach that looks to the statutory definition of the prior offense, focusing solely on whether the elements of the crime of conviction sufficiently match the conduct prohibited by federal law; if the state offense sweeps more broadly, or punishes more conduct than the generic federal definition of the crime, the conviction does not qualify as a predicate offense. *United States v. Oliver*, 987 F.3d 794, 806–07 (8th Cir. 2021) (internal citations and quotations omitted).

When a statute is alleged to be overbroad, a court can either determine that the statute is categorically not overbroad or can determine whether it is "divisible," meaning that it "comprises multiple, alternative versions of the crime." *United States v. Maldonado*, 864 F.3d 893, 897 (8th Cir. 2017); *see also Descamps v. United States*, 570 U.S. 254, 257 (2013) (holding statute is divisible if it "sets out one or more elements of the offense in the

alternative"). If the state statute is divisible, the sentencing court applies the "modified categorical approach," in order to determine "what crime, with what elements, a defendant was convicted of." *Id.* at 897-98 (quoting *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016)). Under the modified categorical approach, courts may "consult a limited class of documents" to determine which crime the defendant was convicted of. *Descamps*, 570 U.S. at 257. The documents a sentencing court may consult include the charging document, plea agreement, and the transcript of the plea colloquy. *Shepard v. United States*, 544 U.S. 13, 20 (2005).

### 2. The Minnesota drug sale statute is divisible.

In making the divisibility determination, state law controls. When determining the elements of a state crime, the Court should first look to authoritative sources of state law including court decisions and the text of the statute itself. *Mathis*, 136 S.Ct. at 2256–57. As the Eighth Circuit has found, where a state statute covers a list of controlled substances but makes the particular identity of the drug an element that the "prosecution must prove to sustain a conviction," the statute is divisible and the court may apply the "modified" categorical approach to determine whether the particular crime involved a federally regulated substance. *Rendon v. Barr*, 952 F.3d 963, 967-68 (8th Cir. 2020), *cert. denied sub nom. Rendon v. Wilkinson*, 141 S. Ct. 1369 (2021). 18 U.S.C. § 924(e)(2)(A)(ii). *See also Oliver*, 987 F.3d at 806–07.

The Eighth Circuit has held that Minnesota's crime of Fifth Degree Possession of a controlled substance is divisible because the identity of the substance involved is an element of that crime. *Rendon*, 952 F.3d at 968. "Elements are the constituent parts of a

crime's legal definition—the things the prosecution must prove to sustain a conviction. At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant …". *Mathis*, 136 S. Ct. at 2248 (internal citations and quotations omitted). As explained by the *Rendon* court, because each drug is a different crime and each supports a different conviction, then the statute is necessarily divisible by substance. Minnesota Supreme Court decisions further make clear that the identity of the controlled substance at issue is an element of the crime that must be proved beyond a reasonable doubt. *State v. Olhausen*, 681 N.W.2d 21, 29 (Minn. 2004) (identity of drug must be proven in first-degree sale of methamphetamine); *State v. Vail*, 274 N.W.2d 127, 133-34 (Minn. 1979) (identity of controlled substance must be proved beyond a reasonable doubt in marijuana sale case); *State v. Dick*, 253 N.W.2d 277, 279 (Minn. 1977) (same).

As relevant to the divisibility analysis here, the Minnesota Second Degree drug sale statute, Minn. Stat. § 152.022 subd. 1(3) (2009), is textually similar to the fifth-degree possession statute the Court found divisible in *Rendon* and a Missouri drug distribution statute it found divisible in *Martinez v. Sessions,* 893 F.3d 1067, 1070 (8th Cir. 2018). In all three statutes, the list of drugs that is found in a separate section from the crime is prefaced by the word "a" rather than "any," signifying that the state must prove the identity of a single substance from a list of alternatives. Under Minn. Stat. § 152.022 subd. 1(3), "A person is guilty of controlled substance crime in the second degree if . . . the person sells one or more mixtures of *a* total weight of 10 grams or more containing amphetamine, phencyclidine, or hallucinogen, or if the controlled substance is packaged in dosage unites, equaling 50 or more dosage units."

Minnesota's Second Degree drug sale statute clearly lays out three alternative elements: "amphetamine, phencyclidine, or hallucinogen." Minn. Stat. § 152.022 subd. 1(3) (2009). "The hallmark of divisibility is the enumeration of alternative bases for conviction separated by the disjunctive 'or.'" *United States v. Bankhead*, 746 F.3d 323, 326 (8th Cir. 2014). Where the statute itself enumerates a list of different options that would be sufficient to sustain a conviction, the statute is divisible and the court can proceed to review *Shepherd* documents in order to determine which alternative the defendant was convicted of." *Id.*, citing *Descamps v. United States*, 133 S.Ct. 2276, 2281, 2285 (2013). Minnesota case law and the statutory text make clear that the identity of the drug is an element of the crime and that the statute is divisible.

### 3. Under the Modified Categorical Approach, it is clear the defendant was solely convicted of selling MDMA.

Because the Minnesota statute is divisible, the modified categorical approach permits an examination of the *Shepard* documents in order to identify the defendant's crime of conviction. Applying the modified categorical approach here, it is clear the defendant was not convicted of selling an innocent isomer of MDMA. In fact, there is no mention of the word isomer within the complaint or plea agreement. Rather, the relevant *Shepard* documents show the defendant was only convicted of selling MDMA, a Schedule I controlled substance. Here, the defendant's plea agreement states the defendant was charged with "Second Degree Controlled Substance Crime (Sale) as set forth in Count [sic] III + IV of the Complaint." Attachment 2, Plea Agreement, p. 1. The narratives for Counts III and IV in the complaint similarly state the pills sold by the defendant "tested positive

for MDMA, a hallucinogen, a Schedule I controlled substance." Attachment 1, Complaint, at pp. 5-6. It is abundantly clear under the modified categorical approach the defendant's conviction only involved the sale of MDMA and not an unlisted isomer.

## B.  The Minnesota Drug Sale Statute is Not Overbroad

### 1. Minnesota's definitions of hallucinogen and isomer are the same as the federal definitions.

As stated above, a person is guilty of Second Degree drug sale if a person "sells one or more mixtures of a total weight of ten grams or more containing . . . hallucinogen." Minn. Stat. 152.022 subd. 1(3) (2009). Under Minnesota law, there were two definitions of hallucinogen. At the time of the defendant's conviction, hallucinogen was defined as "any hallucinogen listed in section 152.02, subdivision 2, clause (3), or Minnesota Rules, part 6800.4210, item C, except marijuana and Tetrahydrocannabinols." Minn. Stat. § 152.01 subd. 5a (2009) (emphasis added). Minnesota's drug schedule, and specifically Section 152.02, subdivision 2, classifies MDMA as a Schedule I controlled substance. Clause 3 of the statute also sets forth which substances generally constitute Schedule I hallucinogens:

> (3) Any material, compound, mixture or preparation which contains any quantity of the following hallucinogenic substances, their salts, isomers and salts of isomers, unless specifically excepted, whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation: . . . 3,4-methylenedioxymethamphetamine.

Minn. Stat. § 152.02, subd. 2(3) (2009). Plainly, section 152.02 refers to "isomers" of MDMA. However, neither sections 152.01 nor 152.02 define the term isomer.

However, Minnesota Rule 6800.4210(C), which is explicitly referenced in Section 152.01 and its definitions, further describes the terms isomer and hallucinogen.[1] Minnesota Rule 6800.4210 provides the following definition of Schedule I hallucinogens:

> C. Hallucinogenic Substances: Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following hallucinogenic substances, or which contains any of its salts, isomers (whether optical, positional, or geometric), and salts of isomers, whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

| Statutory Name | Some examples of common names trade names, or names of products which contain a controlled substance |
|---|---|
| . . . | |
| (7) 3,4-Methylenedioxymeth-amphetamine | MDMA |

Minn. R. 6800.4210(C)(7) (2009).

Akin to the Minnesota drug schedule, the federal Controlled Substances Act (CSA) establishes five schedules of controlled substances. 21 U.S.C. §§ 801, 811, 812, 841(a), and 844(a). The CSA authorizes the Attorney General to add or remove drugs based on specified criteria. *See* 21 U.S.C. § 811(a) and (c); § 812(a) and (b). The CSA's list of Schedule I controlled substances are published in 21 C.F.R. § 1308.11. Within the C.F.R, the list of prohibited hallucinogens are set forth in § 1308.11(d). The CSA's list of

---

[1] The defense omitted reference to Minnesota Rule 6800.4210 (2009) in its supplemental briefing.

prohibited hallucinogens, which include MDMA, also provides a description of which isomers are prohibited under federal law:

> (d) Hallucinogenic substances. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation (for purposes of this paragraph only, the term "isomer" includes the optical, position and geometric isomers):
>
> . . .
>
> (11)   3,4-methylenedioxymethamphetamine (MDMA)

§ 1308.11(d) (2009).

Contrary to the defendant's primary argument, there are no material differences between the state and federal definitions of hallucinogen or isomer. A straightforward comparison of the Minnesota and CSA definitions of hallucinogen confirms they are the same. *See Shular v. United States*, 140 S. Ct. 779, 783 (2020) (noting that under the categorical approach the courts look "only to the statutory definitions).

| Minn. R. 6800.4210(C) | 21 C.F.R. § 1308.11 |
|---|---|
| C. Hallucinogenic Substances: Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following hallucinogenic substances, or which contains any of its salts, isomers (whether optical, positional, or geometric), and salts of isomers, whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation | (d) Hallucinogenic substances. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation (for purposes of this paragraph only, the term "isomer" includes the optical, position and geometric isomers) |

Here, both Minnesota Rule 6800.4210(C) and 21 C.F.R. § 1308.11(d) fundamentally contain the same exact words and phrases. Furthermore, both statutory definitions unambiguously reference optical, positional, and geometric isomers. Other than the placement of the parenthetical that references the different qualifying isomers, there are no material differences between the two statutes. Both Minnesota law and the CSA limit their reach to optical, positional, and geometric isomers of MDMA. Given the matching definitions, it cannot be said that the Minnesota law sweeps more broadly that the CSA. Consequently, the defense's argument fails because the Minnesota definition of hallucinogen is no broader than the federal definition under the CSA.

**2. The defendant's interpretation of the statute conflicts with Minnesota's rules of statutory construction.**

Minnesota's rules of statutory interpretation confirm Minnesota Rule 6800.4210 contains the governing definition of isomer. The defendant's interpretation of the statute –

which entirely ignores Minnesota Rule 6800.4210 and its specific provision regarding isomers – is without support and unfaithful to the rules statutory construction. The defendant's interpretation of the statute also impermissibly adds words to the statute that run counter to the intent of the Minnesota legislature.

Federal courts apply state rules of statutory construction when interpreting state statutes. *In re Dittmaier*, 806 F.3d 987, 989 (8th Cir. 2015). When interpreting a state statute, a federal court is bound by any previous interpretation of the state's highest court. *Missouri v. Hunter*, 459 U.S. 359, 366-68 (1983); *Rhode v. Olk-Long*, 84 F.3d 284, 290 (8th Cir. 1996). In the absence of a prior interpretation, a federal court has a "responsibility to predict, as best [it] can, how the [state high] court would decide the issue." *Brandenburg v. Allstate Ins. Co.,* 23 F.3d 1438, 1440 (8th Cir. 1994).

The object of statutory interpretation under Minnesota law "is to ascertain and effectuate the intention of the legislature." *State v. Randolph*, 800 N.W.2d 150, 154 (Minn. 2011). In all cases of statutory interpretation, courts should begin by analyzing whether the statute is, on its face, ambiguous. *State v. Thonesavanh*, 904 N.W.2d 432, 435 (Minn. 2017). A statute is ambiguous only if it is subject to more than one reasonable interpretation. *Id.* If the statute is subject to more than one reasonable interpretation, then the courts may apply the canons of statutory construction to resolve the ambiguity. *Id.* Under the basic canons of statutory construction, the words and phrases of a statute are construed "according to rules of grammar and according to their most natural and obvious usage unless it would be inconsistent with the manifest intent of the legislature." *ILHC of Eagan, LLC v. Cty. of Dakota*, 693 N.W.2d 412, 419 (Minn. 2005). When interpreting a

statute the courts may not "add words to the statute that the Legislature did not supply." *Depositors Ins. Co. v. Dollansky*, 919 N.W.2d 684, 688 (Minn. 2018).

Minnesota's rules of statutory construction require courts to "read a particular provision in context with other provision of the same statute in order to determine the meaning of the particular provision." *ILHC of Eagan*, 693 N.W. 2d at 419. When possible, the statute should be construed to "give effect to all its provisions." *Randolph*, 800 N.W.2d at 154. However, the statute must be read as a whole and each section interpreted "in light of the surrounding sections to avoid conflicting interpretations." *Id.*

Minnesota law also addresses situations where one provision of a statute conflicts with another provision in the state's law. In such situations, the "[p]articular controls the general." Minn. Stat. § 645.26. subd. 1 (2021). "When a general provision in a law is in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be given to both." *State by Smart Growth Minneapolis v. City of Minneapolis*, 954 N.W.2d 584, 590–91 (Minn. 2021) (quoting Minn. Stat § 645.26, subd. 1 (2021). In resolving conflicts within a statute, courts should embrace a general policy of harmonizing statutes dealing with the same subject matter. *Id.* (citation and quote omitted).

Here, Minnesota law provides two definitions of hallucinogen and isomers. Minnesota defines hallucinogen as "any hallucinogen listed in Section 152.02, subdivision 2, clause (3), or Minnesota Rules, part 6800.4210, item C." Minn. Stat. 152.01, subd. 5a (2009). Section 152.02 states that "isomers" of MDMA are Schedule I controlled substances. However, § 152.02 does not define or further describe what an isomer is. In contrast to § 152.02, Minnesota Rule 6810.4210(C) specifically addresses isomers. The

Rule also limits isomers in the same fashion as federal law: to optical, positional, or geometric isomers. Minn. R. 6800.4210(C); C.F.R. § 1308.11(d). Since there are arguably two different meanings for hallucinogen and isomers, the court may apply the rules of statutory construction to resolve any ambiguity. *Thonesavanh*, 904 N.W.2d at 435.

Under Minnesota's rules of statutory interpretation, and contrary to the defense's argument, hallucinogenic substances does not mean any possible isomers of MDMA. The phrase "all existing isomers" may be the defense's interpretation but those words were added by the defendant in his briefing. The phrase "all existing isomers" is found nowhere in the statute itself. The Court should not accept the defendant's invitation to add words to the law. If the legislature intended for all isomers of MDMA to be criminalized, the legislature would have stated so. Interpreting the statute to mean "all existing isomers" of MDMA does violence to the statutory scheme and impermissibly adds words that the legislature did not supply. *See Dollansky*, 919 N.W.2d at 688.

Moreover, the statutes should be read in way to avoid conflicting interpretations. *Randolph*, 800 N.W.2d at 154. The law should be viewed as a whole with an eye toward general harmony. With this goal of general harmony in mind, it is important to consider the state Board of Pharmacy's special role in regulating controlled substances. Chapter 6800 of the Minnesota Rules sets forth the state regulations for the Board of Pharmacy. Under Minnesota law, "[t]he Board of Pharmacy is authorized to regulate and define additional substances which contain quantities of a substance possessing abuse potential. Minn. Stat. § 152.02, subd. 7 (2009); *see also State v. Ali*, 775 N.W.2d 914, 921 (Minn. Ct. App. 2009) (recognizing the Board of Pharmacy's power to regulate controlled

substances). Unlike the general provision in § 152.02, the Board of Pharmacy's Rule 6810.4210(C) provides a particular definition that limits isomers of MDMA to optical, position, or geographic isomers. It is no accident that the Board of Pharmacy's definition matches the C.F.R. definition nearly word for word. Given the legislature's intent to have the Board of Pharmacy regulate and define controlled substances, it makes sense that the Board's specific definition of isomer within Rule 6810.4210 controls over the general and undefined provision in § 152.02.

### 3. The Minnesota legislature intended to seek uniformity with the federal Controlled Substances Act.

The statutory interpretation above underscores the Minnesota legislature's intent to execute a coherent policy that criminalized the same controlled substances as federal law. Most states, to include Minnesota, use statutory frameworks that generally parallel the federal regime. Contemporaneous with the drafting and consideration of the Controlled Substances Act, state and federal authorities worked together to create a model state law that would "complement the comprehensive drug legislation being proposed to Congress at the national level." Richard Nixon, *Special Message to the Congress on Control of Narcotics and Dangerous Drugs*, Pub. Papers 513, 514 (July 14, 1969) (*Presidential Message*). That model law—the Uniform Controlled Substances Act (1970) (UCSA), 9 U.L.A. 853 (2007)— sought to create "an interlocking trellis of Federal and State law to enable government at all levels to control more effectively the drug abuse problem." UCSA Prefatory Note, 9 U.L.A. 854; see *Presidential Message* 514 (describing federal and state law as an "interlocking trellis"). The UCSA created

drug schedules identical to those in the CSA as originally enacted, and provided a mechanism for States to add or remove drugs, based on the same criteria employed by the Attorney General under the CSA. UCSA § 201 & cmt., 9 U.L.A. 866-870 (setting out criteria identical to those in the federal statute). Because the UCSA called for the States to apply these criteria themselves, the drafters contemplated that, at particular times, the state and federal schedules might not be identical. *See* UCSA Prefatory Note and § 201 cmt., 9 U.L.A. 855, 867.

As detailed in multiple state supreme court decisions, Minnesota adopted the model law known as the UCSA of 1970, in 1971. *See State v. King*, 257 N.W.2d 693, 695-96 (Minn. 1977) ("In 1971, Minnesota adopted in large part the Uniform Controlled Substances Act. L. 1971, c. 937."); *State v. Vernon*, 283 N.W.2d 516, 518 n.1 (Minn. 1979) (same). In both decisions, the Minnesota Supreme Court, interpreting a state provision touching on the legal effect of federal scheduling actions on state schedules, cited language from the UCSA and acknowledged "[o]ne of the major purposes of this act was "to achieve uniformity between the laws of the several States and those of the Federal government." *King*, 257 N.W.2d at 695-96 (citing 9 U.L.A. 146). Going further, the court explained the Minnesota version of the UCSA was "closely patterned after the Federal narcotic and dangerous drug law[.]" *Id*. In other words, the Supreme Court of Minnesota, in interpreting Minnesota's controlled substances laws, recognized the need to "achieve uniformity" between state and federal law. *King*, 257 N.W.2d at 695-96.

Additionally, Minnesota's drug scheduling law contains a statutory provision that articulates the state legislature's intent to achieve uniformity with federal law.

Minnesota Statute § 152.02, subdivision 12, entitled "Coordination of controlled substance regulation with federal and state statute," sets forth the required procedures for Minnesota to ensure uniformity with federal law. That provision states:

> If any substance is designated, rescheduled, or deleted as a controlled substance under federal law and notice thereof is given to the state Board of Pharmacy, the state Board of Pharmacy *shall similarly* control the substance under this chapter, after the expiration of 30 days from publication in the Federal Register of a final order designating a substance or rescheduling or deleting a substance.

Minn. Stat. §152.02, subd. 12 (2009) (emphasis added). Similar to Minnesota Supreme Court's holdings on the matter, Minnesota statutes likewise demonstrate that Minnesota sought uniformity with federal law and not to criminalize unlisted substances. This would be especially true where, as here, the State of Minnesota has never attempted to utilize its scheduling authority to place additional isomers of MDMA on its schedule that were not included in the federal schedule.

Both the historical record and Minnesota's own interpretation of its controlled substance laws rebut defendant's suggestion that Minnesota law, by failing to explicitly track a subsequent Congressional amendment to federal law (i.e. the subsequent decision to define the word "isomer"), created the overbreadth now alleged by defendant—that Minnesota law regulates additional isomers of MDMA as compared to federal law. This argument, however, explicitly disregards the prefatory language from the UCSA discussed in the *King* case, the model legislation adopted by the Minnesota legislature in 1971, and also disregards the Supreme Court of Minnesota's instructions from both *King* and *Vernon* concerning the interpretation of state and federal law and

the need for uniformity. Moreover, and perhaps more importantly, defendant's suggestion of overbreadth would invite this Court to find that Congress' legislative action in defining isomers substitutes as legislative intent for Minnesota legislature. Indeed, if Minnesota intended to regulate isomers outside of those already regulated by federal law, the State would not wait for the federal government to pass a definitional clarification and then do nothing, but would instead utilize its own authority to unambiguously place additional substances on their state schedules. The failure to do that in this instance speaks volumes. This court should decline defendant's invitation to glean state legislative intent from *federal* action and instead find, consistent with the authorities above, that the federal and state definitions of hallucinogen, MDMA, and isomer are one and the same.

### 4. In circumstances when the state law matches federal law, the defendant must show a "reasonable probability" that Minnesota would apply the MDMA sale statute overbroadly.

The Court should also reject the defendant's claim of overbreadth because there is no reasonable probability that a person would be convicted of selling an unlisted isomer of MDMA in Minnesota. The Supreme Court has held, "[t]o find that a state statute creates a crime outside the generic definition of a listed crime in a federal statute requires more than the application of legal imagination to a state statute's language. It requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007).

The realistic probability analysis is appropriate where, as here, the state statute is

not more broad than federal law. *See Salmoran v. Attorney Gen.* 909, F.3d 73, 81-82 (3d Cir. 2018) (holding the reasonable probability test is unnecessary when the state statute "plainly encompasses more conduct than its federal counterpart"). When the state and federal statutes essentially mirror each other, an offender should present a realistic probability or "at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues." *See United States v. Maldonado*, 864 F.3d 893, 900 (8th Cir. 2017) (quoting *Fletcher v. United States*, 858 F.3d 501, 507 (8th Cir. 2017), quoting *Duenas-Alvarez*, 549 U.S. at 193).

In preparation for this response, the United States obtained a Declaration from Eric Grunwald, Forensic Science Supervisor in the Chemistry section of the State of Minnesota's Bureau of Criminal Apprehension (BCA) Forensic Science Services (FSS) Laboratory ("BCA FSS"). Attachment 3, Grunwald Decl. As noted in the Grunwald Declaration, the BCA FSS is the only full service, accredited forensic science laboratory in Minnesota. Attachment 3, Grunwald Decl. ¶5. The Chemistry section receives suspected controlled substance evidence from law enforcement agencies across Minnesota. *Id*. For example, in calendar year 2020, the Chemistry section issued more than 9,600 reports for evidence suspected to contain a controlled substance, often addressing more than one item. *Id*. During that same year, more than 100 reports were issued that identified MDMA. *Id.*

The Grunwald Declaration makes clear that when the BCA FSS Chemistry section issues a report using the language "containing 3, 4 methylenedioxymethamphetamine (MDMA)", that report indicates that an optical isomer of MDMA was identified. *Id.* at ¶¶17-25. Indeed, based on the BCA FSS testing methodology used over at least the last

19

two decades, a substance would only yield a result for MDMA if the compound was an optical isomer of MDMA. *Id*. at ¶¶20-29. Stated another way, if the compound does not contain an optical isomer of MDMA, it would not yield a positive test result for MDMA.

The Grunwald Declaration notes that positional and functional isomers of MDMA have unique chemical names other than MDMA. However, "any report issued by the BCA FSS Chemistry section identifying a positional or functional isomer of methamphetamine would use the unique name of that compound (e.g. "containing *2,3*-methylenedioxymethamphetamine" or "containing 3,4-methylenedioxy*phentermine*")." *Id*. at ¶24. "Such a report would in turn *not* indicate a result for 3,4-methylenedioxymethamphetamine MDMA." *Id.* (emphasis added). In other words, there is no such thing as a positive result for "MDMA" that does not actually an optical isomer of MDMA.

Here, the defendant cannot demonstrate a realistic probability that the State of Minnesota would apply the Minnesota Controlled Substances Act to criminalize MDMA isomers outside of federal law. See *Duenas-Alvarez*, 549 U.S. at 183; *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2012) (quoting *Duenas-Alvarez*, 549 U.S. at 193) (describing the realistic probability inquiry as a way to ensure that the categorical approach does not become "an invitation to apply 'legal imagination' to the state offense."). In *Moncrieffe*, the Supreme Court explained that "to defeat the categorical approach" a defendant "would have to demonstrate the State actually prosecutes the relevant offense" more broadly than federal law. *Moncrieffe*, 569 U.S.at 206. In this instance, the defendant presents no facts or caselaw demonstrating a realistic probability (instead of a theoretical possibility) that

Minnesota would apply its MDMA sale law more broadly than federal law. In fact, the BCA's drug testing in the defendant's case confirms that he sold MDMA and not an innocent isomer. Attachment 3, Grunwald Decl. ¶ 25. Here, the Defendant cannot show that the state would be able to prosecute a case involving MDMA isomers that falls outside of federal law even if it wanted to.

Because Defendant cannot demonstrate his MDMA sale conviction could be enforced more broadly than federal law, his claim that his sale convictions do not qualify fails. See *Duenas-Alvarez*, 549 U.S. at 193 (it is defendant's burden to show a reasonable probability). What's more, Minnesota's MDMA law cannot sweep more broadly because it is identical to federal law. Thus, the defendant's MDMA sale convictions are predicate offenses for purposes of 18 U.S.C. § 924(e).

## C. The defendant's prior offenses were "committed on occasions different from another."

Lastly, the defendant argues that the sentencing court may not decide whether his predicate offenses took place on different occasions. However, the PSR correctly concluded that the three qualifying predicates were committed on different dates. PSR ¶¶ 25, 36, 38, and 41. Furthermore, binding Eighth Circuit forecloses the defendant's argument.

The ACCA applies to a felon in possession of a firearm who has "three previous convictions . . . for a violent felony or a serious drug offense, or both." 18 U.S.C. § 924(e)(1). The three qualifying offenses must be "committed on occasions different from one another." *Id.* There are at least three factors to consider when determining whether

prior offenses were committed on different occasions: "(1) the time lapse between offenses, (2) the physical distance between their occurrence, and (3) their lack of overall substantive continuity, a factor that is often demonstrated in the violent-felony context by different victims or different aggressions." *United States v. Pledge*, 821 F.3d 1035, 1038 (8th Cir. 2016) (internal quotation omitted).

The determination of whether prior offenses were committed on different occasions is made by the sentencing court. *See, e.g., United States v. Evans*, 794 F.3d 885, 887 (8th Cir. 2015) (recognizing that whether prior offenses were committed on different occasions is among recidivism-related facts appropriately determined by the sentencing court). To make that determination, a sentencing court may refer to *Shepard* documents, such as "the charging document, the terms of a plea agreement or transcript of colloquy . . . or to some comparable judicial record." *United States v. McDaniel*, 925 F.3d 381, 388 (8th Cir. 2019) (internal quotation marks and citations omitted); *Levering v. United States*, 890 F.3d 738, 741 n.2 (8th Cir.2 018) (taking "conservative approach," consistent with other circuits, by considering only *Shepard* charging documents and judgments in making different occasions determination)).

In *Alleyne v. United States*, 133 S.Ct. 2151 (2013), the Supreme Court held that any fact that increases the mandatory minimum sentence for a crime is an element of the crime that must be either admitted by a defendant or submitted to a jury. But the Supreme Court recognized a narrow exception to this general rule for the fact of a prior conviction in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). The Eighth Circuit has explicitly recognized that *Alleyne* "le[ft] the 'fact of prior conviction' exception

intact." *United States v. Cole*, 778 F.3d 1055, 1056 (8th Cir. 2015) (quoting *Alleyne*, 133 S.Ct. at 2160 n. 1). Binding precedent makes clear whether the defendant's prior offenses were committed on different occasions is among the recidivism-related facts that are not elements that must be admitted or proven to a jury. *United States v. Harris*, 794 F.3d 885, 887 (8th Cir. 2015).

## CONCLUSION

The defendant is an Armed Career Criminal, pursuant to 18 U.S.C. § 924(e), because he was convicted of three predicate offenses before possessing a firearm. For the reasons above, the government respectfully requests a sentence of 180 months imprisonment.

Respectfully submitted,

Dated:  November 29, 2021

CHARLES J. KOVATS Jr.
Acting United States Attorney

*s/Bradley M. Endicott*

BY:  BRADLEY M. ENDICOTT
Assistant U.S. Attorney
Attorney ID No. 0349872